UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| | : | Hon. |
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 09-656 (JHC) |
| v. | : | |
| | : | |
| GORDON D. McDONALD, | : | Title 18, United States Code, |
| JOHN A. BENNETT, and | : | Sections 371, 1031, 1512(c)(2), |
| JAMES E. HAAS, JR. | : | 1956(h); Title 15, United States |
| | : | Code, Section 1; Title 41 United |
| | : | States Code, Sections 53 and 54; |
| | : | and Title 26, United States Code, |
| | : | Section 7206(1). |
| | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as

follows:

### COUNT ONE: 18 U.S.C. §371
### (Kickback and Fraud Conspiracy)

### INTRODUCTION

1. At all times relevant to this Indictment unless otherwise stated:

(a) Defendant GORDON D. McDONALD (hereinafter "McDONALD")

was a project manager for a general contractor (hereinafter "P-C") which was responsible

1

for the environmental remediation of hazardous sites throughout the United States. McDONALD also owned a shell company which used various addresses in New Jersey (hereinafter "Company-1"). P-C was awarded the following two U.S. Government contracts as a prime contractor:

(1) On or about December 15, 2000, the United States Army Corps of Engineers (hereinafter "USACE"), a federal Executive Branch agency within the United States Department of Defense, awarded a Pre-Placement Remedial Contract (hereinafter "PRAC"), #DACW41-01-D-0001 (hereinafter "Contract One"), to P-C for the environmental remediation of federally-funded sites, including the Federal Creosote Superfund Site in Manville, New Jersey (hereinafter "Federal Creosote"). The United States Environmental Protection Agency (hereinafter "EPA") paid P-C a fixed percentage fee plus the cost of the remedial action performed by sub-contractors at the site. The total value of Contract One for Federal Creosote was in excess of $1 million.

(2) On or about July 28, 2004, USACE awarded PRAC #W912DQ-04-D-0023 (hereinafter "Contract Two") to P-C to continue its remediation of Federal Creosote. The EPA paid P-C a fixed percentage fee plus the cost of the remedial action performed by sub-contractors at the site. The total value of Contract Two was in excess of $1 million.

2.     At all times relevant to this Indictment unless otherwise stated, defendant JOHN A. BENNETT (hereinafter "BENNETT") was the Chairman of the Board of

2

Bennett Environmental, Inc. (hereinafter "BEI"). BENNETT was also the Chief

Executive Officer of BEI until approximately February 2004. BEI is a corporation

existing under the laws of Canada with its main office located in Oakville, Ontario,

Canada. BEI transported, treated and disposed of contaminated soils as a sub-contractor

for P-C at Federal Creosote.

3.      At all times relevant to this Indictment unless otherwise stated, Z.T., a co-

conspirator not named as a defendant herein, was the Vice President of Business

Development of BEI.

4.      At all times relevant to this Indictment unless otherwise stated, R.P.G., a

co-conspirator not named as a defendant herein, held a number of sales and marketing

positions for BEI in which he was responsible for projects within the United States.

**Overview of Federal Creosote**

5.      Federal Creosote, which was designated by the EPA as a Superfund site,

occupies approximately 53 acres in a highly developed residential/commercial area in the

Borough of Manville in Somerset County, New Jersey. The area was contaminated

through the operation of a wood processing facility that treated railroad ties with coal tar

creosote, from approximately 1910 to the mid 1950s. Coal tar creosote is a wood

preservative that may cause skin irritation and respiratory problems.

**Overview of the Procurement Process**

6.     Pursuant to an interagency agreement between the EPA and the USACE, the USACE oversaw the procurement process for sub-contractors used by P-C at the site. Under the terms of Contracts One and Two, P-C was required to award sub-contracts at Federal Creosote subject to a competitive bidding policy under the Federal Acquisition Regulation system (hereinafter "FAR"). The purpose of the FAR's bidding policy was to ensure that P-C obtained supplies and services at competitive, fair market prices. Pursuant to a "Request for Proposals", P-C was required to solicit at least three competitive bids before entering into any sub-contract for supplies or services in excess of $5,000, and award those sub-contracts to the bidder offering the best value, based on cost, quality and timeliness. However, in late 2003, pursuant to an "Invitation for Bids" USACE required P-C to award a certain sub-contract for the removal, treatment and disposal of contaminated soils to the lowest bidder.

7.     The FAR prohibited kickbacks from a sub-contractor to a prime contractor for the purpose of improperly obtaining or rewarding favorable treatment in connection with a sub-contract relating to a prime contract.

8.     The FAR also prohibited disclosure of a competitor's bid information from a prime contractor to a sub-contractor before the award of a Federal agency procurement contract to which the bid information relates.

9. McDONALD was responsible for soliciting bids from vendors for sub-contracts in excess of $5,000 and otherwise ensuring that P-C's procurement process at Federal Creosote was in accordance with the FAR.

## THE CONSPIRACY

10. From approximately December 2001 until approximately August 2004, the exact dates being unknown to the United States, in the District of New Jersey and elsewhere, defendants

GORDON D. McDONALD and
JOHN A. BENNETT

knowingly and willfully conspired and agreed with each other, Z.T., R.P.G., and others to:

(a) provide and attempt to provide kickbacks to McDONALD, Company-1 and certain other employees of P-C, who were co-conspirators, to solicit and accept kickbacks from BEI, and include the amount of certain kickbacks in the sub-contract price that BEI charged to P-C on at least one sub-contract at Federal Creosote, thereby causing P-C to include the fraudulently inflated amount as part of the costs it charged to the EPA, contrary to Title 41, United States Code, Sections 53 and 54;

(b) execute a scheme or artifice with the intent to defraud the United States, namely the EPA, and with the intent to obtain money or property by means of materially false and fraudulent pretenses, representations and promises in the procurement of property and services as a prime contractor with the United States and as a sub-

5

contractor in connection with Contract One and Contract Two, as referenced in Paragraph 1 above, the value of which contracts were each $1 million or more, contrary to Title 18, United States Code, Section 1031; and

(c) devise a scheme and artifice to defraud the United States, namely the EPA, and to obtain money and property from the EPA by means of false and fraudulent pretenses, representations, and promises, by transmitting and causing to be transmitted by means of wire communication in interstate commerce or foreign commerce, any writings, signs, signals and sounds, contrary to Title 18, United States Code, Section 1343.

## MEANS AND METHODS OF THE CONSPIRACY

11.     Among the means and methods employed by McDONALD and BENNETT to carry out the conspiracy and effect the unlawful objects set forth above were those set forth in Paragraphs 12 through 16 below.

**Kickbacks to a Prime Contractor and Fraudulently Inflated Bid Prices**

12.     It was a part of the conspiracy that BENNETT, Z.T., and R.P.G. provided kickbacks to McDONALD, Company-1 and certain other employees of P-C, who were co-conspirators. BENNETT, Z.T. and R.P.G. provided kickbacks in order to influence the award of sub-contracts by P-C for the treatment, removal and disposal of contaminated soil by BEI at Federal Creosote.

13.     It was a further part of the conspiracy that McDONALD, BENNETT, Z.T. and R.P.G. fraudulently inflated the amount of BEI's bid price for a sub-contract without

USACE's knowledge, consent, or authorization. This fraudulently inflated amount included kickbacks BENNETT, Z.T. and R.P.G. made to McDONALD, Company-1, and certain other employees of P-C, who were co-conspirators, plus an amount that BEI kept for itself. McDONALD caused P-C to include the fraudulently inflated amount as part of the costs it charged to the EPA under Contract One for work performed by BEI.

14. BENNETT, Z.T. and R.P.G. provided kickbacks to Company-1 via wire transfers from BEI's bank account in Canada to Company-1's bank account in New Jersey. McDONALD issued false Company-1 invoices to BEI as a means of concealing the true nature of the kickbacks.

15. BENNETT, Z.T. and R.P.G. also provided kickbacks to McDONALD and certain other employees of P-C, who were co-conspirators, that included but were not limited to trips, entertainment tickets, pharmaceuticals and wine.

**Fraudulent Disclosure of Competitors' Bid Prices**

16. It was a further part of the conspiracy that McDONALD fraudulently disclosed the bid prices of other vendors to BEI before the sub-contracts were awarded by P-C without USACE's knowledge, consent, or authorization. BENNETT, Z.T. and R.P.G. then used their knowledge of the other vendors' bid prices to submit the highest possible BEI prices to P-C and still be awarded the sub-contracts. As a result, BEI was awarded the sub-contracts at prices higher than it would have otherwise bid, causing the

EPA to pay more for these sub-contracts than it otherwise would have if the FAR requirements were followed under Contract One and Contract Two.

## OVERT ACTS

17. In furtherance of the conspiracy and to effect the illegal object thereof, McDONALD, BENNETT and others known and unknown, committed the following overt acts, among others, in the District of New Jersey and elsewhere:

(a) On or about December 14, 2001, with the approval of BENNETT, and pursuant to the kickback arrangement, R.P.G. purchased executive party suite hockey tickets costing approximately $17,500 for executives and employees of P-C, who were co-conspirators.

(b) On or about May 13, 2002, McDONALD fraudulently disclosed the bid prices of at least one of BEI's competitors to BEI prior to a bid opening for a sub-contract, which enabled BEI to be awarded the sub-contract at a price higher than it would have otherwise bid.

(c) On or about August 26, 2002, pursuant to the kickback and fraud arrangement, and with the approval of BENNETT, R.P.G. purchased a 10 day cruise through the Mediterranean costing approximately $75,000, for himself, his guest, McDONALD, McDONALD's wife, three other executives of P-C, who were co-conspirators, and their guests.

(d) On or about July 21, 2003, pursuant to the kickback and fraud arrangement, BENNETT and R.P.G. caused a $76,095 wire transfer to be sent from BEI's bank account in Canada to Company-1's bank account in New Jersey.

(e) On or about October 29, 2003, McDONALD fraudulently disclosed the bid prices of at least one of BEI's competitors to BEI prior to a bid opening for a sub-contract, which enabled BEI to be awarded the sub-contract at a price higher than it would have otherwise bid.

(f) On or about December 8, 2003, McDONALD fraudulently disclosed the bid prices of at least one of BEI's competitors to BEI prior to a bid opening for a sub-contract, which enabled BEI to be awarded the sub-contract at a price higher than it would have otherwise bid.

(g) On or about April 19, 2004, pursuant to the kickback and fraud arrangement, BENNETT, Z.T. and R.P.G. caused a $77,570 wire transfer to be sent from BEI's bank account in Canada to Company-1's bank account in New Jersey.

(h) On or about August 18, 2004, pursuant to the kickback and fraud arrangement, McDONALD caused BEI to submit a purchase order to P-C.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

## COUNT TWO: 18 U.S.C. §1031
## (Major Fraud Against the United States)

1. The allegations set forth in Paragraphs 1 through 9 and 12 through 16 of Count 1 of this Indictment are hereby realleged as if set forth fully herein.

2. On or about May 15, 2002, in the District of New Jersey and elsewhere, the defendants

GORDON D. McDONALD and
JOHN A. BENNETT

knowingly and willfully executed and attempted to execute a scheme and artifice with the intent to defraud the United States, namely the EPA, and with the intent to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, by McDONALD and BENNETT causing BEI to submit a fraudulently inflated bid price to P-C, which enabled BEI to be awarded the sub-contract at a price higher than it would have otherwise bid in the procurement of property and services as a prime contractor with the United States and as a sub-contractor in connection with Contract One, the value of which contract was $1 million or more.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1031(a).

## COUNT THREE: 18 U.S.C. §1956(h)
## (Conspiracy to Launder Monetary Instruments)

1.      The allegations set forth in Paragraphs 1 through 9, and 12 through 16 of

Count 1 of this Indictment are hereby realleged as if set forth fully herein.

### INTRODUCTION

2.      At all times relevant to this Indictment unless otherwise stated, R.P.G.

owned Discount Canadian Pharmaceuticals, d/b/a DCP Technical Services, Inc.

(hereinafter "DCP").

### THE CONSPIRACY

3.      From approximately February 2003 until approximately September 2004, in

the District of New Jersey and elsewhere, defendant

### GORDON D. McDONALD

knowingly and willfully conspired and agreed with R.P.G. and others to transport,

transmit, and transfer funds, that is approximately $207,000 from a place in the United

States to and through a place outside the United States with the intent to promote the

carrying on of specified unlawful activity, namely wire fraud in violation of Title 18,

United States Code, Section 1343, contrary to Title 18 United States Code, Section

1956(a)(2)(A).

11

## MEANS AND METHODS OF THE CONSPIRACY

4.      Among the means and methods employed by McDONALD to carry out the
conspiracy and effect the unlawful objects set forth above were those set forth in
Paragraphs 5 through 7 below.

5.      It was part of the conspiracy that in approximately February 2003,
McDONALD and R.P.G. agreed that R.P.G. would receive a portion of McDONALD's
kickbacks being sent by wire transfer from BEI to Company-1, as described in Paragraphs
10, 12 and 14 of Count 1, as part of the fraud and kickback scheme described in Count 1.

6.      It was further part of the conspiracy that McDONALD directed R.P.G. to
submit false and fraudulent invoices from DCP to Company-1 for wetlands analyses that
were never performed.  Thereafter, McDONALD paid DCP by Company-1 checks and
wire transfers from Company-1's First Union National Bank account # xxxxxxxxx9793
located in New Jersey to DCP's accounts # xxxxxxxx3612 and # xxxxxxxxxx6260 at
Royal Bank of Canada located in Oakville, Ontario, Canada.

7.      These transactions occurred on or about the following dates:

         (a) On or about February 5, 2003, a $28,500 wire transfer was sent by
McDONALD from Company-1's account to a DCP account;

         (b) On or about March 17, 2003, a $42,705 wire transfer was sent by
McDONALD from Company-1's account to a DCP account;

(c) On or about August 21, 2003, a $28,880 wire transfer was sent by McDONALD from Company-1's account to a DCP account;

(d) On or about September 19, 2003, a $27,645 Company-1 check signed by McDONALD was deposited by R.P.G. in a DCP account;

(e) On or about December 23, 2003, a $38,900 Company-1 check signed by McDONALD was deposited by R.P.G. in a DCP account;

(f) On or about March 5, 2004, a $38,225 Company-1 check signed by McDONALD was deposited by R.P.G. in a DCP account; and

(g) On or about September 8, 2004, a $3,391 Company-1 check signed by McDONALD was deposited by R.P.G. in a DCP account.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1956(h).

## COUNT FOUR: 15 U.S.C. §1
### (Bid Rigging)

1. The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1 of this Indictment are hereby realleged as if set forth fully herein.

## INTRODUCTION

2. At all times relevant to this Indictment unless otherwise stated:

(a) J.D., a co-conspirator not named as a defendant herein, owned J.M.J. Environmental, Inc., (hereinafter "JMJ"), a wastewater treatment and chemical supply company that submitted bids for sub-contracts to provide supplies and services to P-C at Federal Creosote.

13

(b)  A.S., a co-conspirator not named as a defendant herein, owned a heating and air conditioning services company that submitted bids for sub-contracts to provide supplies and services to P-C at Federal Creosote.

(c)  M.F., a co-conspirator not named as a defendant herein, owned a wastewater treatment and supplies manufacturing company that submitted bids for sub-contracts to provide supplies and services to P-C at Federal Creosote.

(d) N.S.,  a co-conspirator not named as a defendant herein, was the Assistant Project Manager / Contracts Administrator for P-C at Federal Creosote and was influential in the procurement of sub-contracts at the site from approximately December 2001 through October 2003.

## TRADE AND COMMERCE

3.      From approximately October 2002 until approximately June 2005, pursuant to sub-contracts that are the subject of this Count, P-C awarded approximately $242,800 in sub-contracts for wastewater treatment supplies and services to JMJ.

4.      During the period covered by this Count, JMJ provided wastewater treatment supplies and services to P-C, including granulated activated carbon obtained from distributors located outside the State of New Jersey pursuant to the sub-contracts that are the subject of this Count, which were shipped across state lines, in a continuous and uninterrupted flow of interstate commerce.  Granulated activated carbon is used in wastewater treatment plants to filter hazardous chemicals.

14

5. The activities of McDONALD, N.S., J.D., A.S., and M.F. with respect to the sale of wastewater treatment supplies and services to P-C, including the sale of granulated activated carbon pursuant to sub-contracts that are the subject of this Count, were within the flow of, and substantially affected, interstate trade and commerce.

## DESCRIPTION OF THE OFFENSE

6. From approximately October 2002 until approximately June 2005, the exact dates being unknown to the United States, defendant

### GORDON D. McDONALD

engaged in a combination and conspiracy in unreasonable restraint of trade and commerce contrary to Section 1 of the Sherman Act (Title 15, United States Code, Section 1).

7. The aforesaid combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among McDONALD, N.S., J.D., A.S., and M.F. the substantial terms of which were to rig bids and allocate sub-contracts for wastewater treatment supplies and services to P-C at Federal Creosote.

8. For the purpose of forming and effectuating the aforesaid combination and conspiracy, McDONALD, N.S., J.D., A.S., and M.F. did those things which they combined and conspired to do, including, among other things:

(a) McDONALD and N.S. designated in advance whether JMJ would be the low bidder on sub-contracts for wastewater treatment supplies and services to P-C.

15

(b) McDONALD, N.S. and J.D discussed and agreed on the prices that would be bid on sub-contracts for wastewater treatment supplies and services to P-C;

(c) McDONALD and N.S. requested that J.D. obtain two other, intentionally high, noncompetitive bids to submit on sub-contracts for wastewater treatment supplies and services to P-C.

(d) A.S. and M.F. agreed with J.D. to submit intentionally high, non-competitive bids in order to make it appear that there had been competition for the sub-contracts.

9.    As a result of the aforementioned conspiracy, the EPA paid more for the wastewater treatment supplies and services it purchased pursuant to the sub-contracts that are the subject of this Count than it would have had the sub-contracts been awarded pursuant to truly competitive bidding, or otherwise competitive pricing.

## JURISDICTION AND VENUE

10.    The aforesaid combination and conspiracy was formed and carried out, in part, within the District of New Jersey within the five years preceding the filing of this Information.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

## COUNT FIVE: 18 U.S.C. § 371
## (Kickback and Fraud Conspiracy)

1.      The allegations set forth in Paragraphs 1, 5 through 9 of Count 1 and

Paragraph 2 of Count 4 of this Indictment are hereby realleged as if set forth fully herein.

## Overview of the Diamond Alkali Superfund Site (hereinafter "Diamond Alkali")

2.      Diamond Alkali is an EPA designated Superfund site in Newark, New

Jersey. The site was divided into three geographic regions: the 80 and 120 Lister Avenue

properties, the Lower Passaic River Study Area and the Newark Bay Study Area. The

EPA initiated emergency remedial action in 1983 with respect to the Lister Avenue

properties. An interim remediation plan was later implemented under a consent decree

between Tierra Solutions, Inc. ("Tierra Solutions"), the EPA and the New Jersey

Department of Environmental Protection for the Lister Avenue properties whereby, under

USACE oversight, Tierra Solutions would be financially responsible for the remedial

action and maintenance of the site. Remedial action began in approximately April 2000

when P-C was selected by Tierra Solutions as the general contractor for the site.

3.      McDONALD and N.S. were responsible for acquiring supplies and services

in connection with purchases less than $5,000 at Diamond Alkali. Sub-contracts above

$5,000 were usually awarded by McDONALD and/or officials in the Niagara Falls, NY

office of P-C.

## THE CONSPIRACY

4.    From approximately January 2002 until approximately April 2007, the exact

dates being unknown to the United States, in the District of New Jersey and elsewhere,

defendant

### GORDON D. McDONALD

knowingly and willfully conspired and agreed with J.D., N.S. and others to:

(a)  provide and attempt to provide kickbacks to McDONALD and N.S., to

solicit and accept kickbacks from J.D., and include the amount of the kickbacks in the

sub-contract prices charged to P-C, thereby causing P-C to charge inflated prices to the

EPA and the United States, contrary to Title 41, United States Code, Sections 53 and 54;

and

(b)  devise a scheme and artifice to defraud the United States, namely the

EPA, and Tierra Solutions, including a scheme to obtain money and property from the

EPA and Tierra Solutions by means of false and fraudulent pretenses, representations, and

promises, for the purpose of executing such scheme and artifice to defraud, and

attempting to do so, would and did place in post offices and authorized depositories for

mail matter, and would and did deposit, and cause to be deposited, matters and things to

be sent and delivered by the Postal Service and by private and commercial interstate

carriers, and would and did take and receive such matters and things therefrom, and

would and did cause such matters and things to be delivered by mail and by such carriers

18

according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, contrary to Title 18, United States Code, Section 1341.

## MEANS AND METHODS OF THE CONSPIRACY

5.      Among the means and methods employed by McDONALD, J.D. and N.S. to carry out the conspiracy and effect the unlawful objects set forth above were those set forth in Paragraphs 6 through 8 below.

6.      It was a part of the conspiracy that J.D. provided kickbacks to Company-1, McDONALD and N.S. in order to influence the award of sub-contracts by P-C for wastewater treatment supplies and services to JMJ at Federal Creosote and Diamond Alkali.

7.      It was further part of the conspiracy that McDONALD, J.D. and N.S. fraudulently inflated JMJ's bid prices and invoices to include the cost of kickbacks, and then caused P-C to include the costs of the kickbacks in the prices it charged to the EPA at Federal Creosote and to Tierra Solutions at Diamond Alkali.

8.      It was further part of the conspiracy that McDONALD and N.S. awarded sub-contracts to JMJ in return for J.D.'s payment of kickbacks to McDONALD and N.S..

19

## OVERT ACTS

9.  In furtherance of the conspiracy and to effect the illegal objects thereof, the defendant and others known and unknown, committed the following overt acts, among others, in the District of New Jersey and elsewhere:

(a)  On or about July 29, 2002, pursuant to the kickback and fraud arrangement, McDONALD issued a fraudulent Company-1 invoice to JMJ for $33,716.25. Thereafter, J.D. sent a $33,716.25 check to Company-1.

(b)  On or about August 12, 2004, McDONALD caused J.D. to issue a fraudulently inflated JMJ invoice to P-C pursuant to a change order sent through the United States mails. The change order was sent through the United States mails from P-C's office in Niagara Falls, NY to J.D. in New Jersey.

(c)  On or about October 4, 2004, pursuant to the kickback and fraud arrangement, McDONALD issued a fraudulent Company-1 invoice to JMJ for $52,490.18. Thereafter, J.D. sent a $22,490.18 check and a $30,000 check to Company-1.

(d)  On or about December 29, 2004, pursuant to the kickback and fraud arrangement, McDONALD caused J.D. to purchase airline tickets and hotel reservations for McDONALD and his guest to travel to Los Cabos, Mexico.

(e) On or about February 21, 2006, pursuant to the kickback and fraud arrangement, McDONALD caused J.D. to make a $3,000 payment on McDONALD's Citi Bank credit card that was sent through the United States mails.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

## COUNT SIX: 41 U.S.C. §§ 53 and 54
### (Kickback to a Prime Contractor)

1. The allegations set forth in Paragraphs 1, 5 through 9 of Count 1; Paragraph 2(a) of Count 4; and Paragraphs 6 through 8 of Count 5 of this Indictment are hereby realleged as if set forth fully herein.

2. On or about October 19, 2004, in the District of New Jersey and elsewhere, defendant

### GORDON D. McDONALD

knowingly and willfully accepted a kickback in the form of two checks from J.D. totaling $52,490.18, payable to Company-1, drawn on the account of JMJ, for the purpose of improperly rewarding and obtaining favorable treatment in connection with a sub-contract relating to a prime contract entered into by the United States and P-C.

ALL IN VIOLATION OF TITLE 41, UNITED STATES CODE, SECTIONS 53 and 54.

## COUNT SEVEN: 18 U.S.C. § 371
### (Kickback and Fraud Conspiracy)

1.    The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1 and

Paragraph 2 of Count 6 of this Indictment are hereby realleged as if set forth fully herein.

### INTRODUCTION

2.    At all times relevant to this Indictment unless otherwise stated, V.B., a co-

conspirator not named as a defendant herein, was a co-owner of National Industrial

Supply LLC (hereinafter "NIS") which was a New Jersey limited liability company

located in Middlesex, New Jersey. NIS was a supplier of industrial pipes, valves and

fittings that provided supplies and services as a sub-contractor to P-C at Federal Creosote

and at Diamond Alkali.

### THE CONSPIRACY

3.    From approximately December 2000 until approximately September 2004,

the exact dates being unknown to the United States, in the District of New Jersey and

elsewhere, defendant

GORDON D. McDONALD

knowingly and willfully conspired and agreed with V.B., N.S. and others to:

(a) provide and attempt to provide kickbacks to McDONALD and N.S., to

solicit and accept kickbacks from NIS, and include the amount of the kickbacks in the

sub-contract prices charged to P-C at Federal Creosote, thereby causing P-C to charge

those inflated prices to the EPA and the United States, contrary to Title 41, United States Code, Sections 53 and 54; and

(b) devise a scheme and artifice to defraud the United States, namely, the EPA, and Tierra Solutions, including a scheme to obtain money and property from the EPA and Tierra Solutions by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice to defraud, and attempting to do so, would and did place in post offices and authorized depositories for mail matter, and would and did deposit, and cause to be deposited, matters and things to be sent and delivered by the Postal Service and by private and commercial interstate carriers, and would and did take and receive such matters and things therefrom, and would and did cause such matters and things to be delivered by mail and by such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, contrary to Title 18, United States Code, Section 1341.

## MEANS AND METHODS OF THE CONSPIRACY

4. Among the means and methods employed by McDONALD, V.B. and N.S. to carry out the conspiracy and effect the unlawful objects set forth above were those set forth in Paragraphs 5 through 7 below.

5. It was part of the conspiracy that V.B. provided kickbacks to Company-1, McDONALD and N.S. in order to influence the award of sub-contracts by P-C for

supplies that included but were not limited to industrial pipes, valves and fittings to NIS at Federal Creosote and Diamond Alkali.

      6.     It was further part of the conspiracy that McDONALD, V.B., and N.S. fraudulently inflated NIS's bid prices and invoices to include the cost of kickbacks, and then caused P-C to include the costs of the kickbacks in the prices it charged to the EPA at Federal Creosote and to Tierra Solutions at Diamond Alkali.

      7.     It was further part of the conspiracy that McDONALD and N.S. awarded sub-contracts to NIS in return for V.B.'s payment of kickbacks to McDONALD and N.S..

      8.     It was further part of the conspiracy that McDONALD and N.S. caused P-C to make payments to NIS based on fraudulently inflated invoices.

## OVERT ACTS

      9.     In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and others known and unknown, committed the following overt acts, among others, in the District of New Jersey and elsewhere:

      (a)  On or about December 27, 2000, pursuant to their kickback and fraud arrangement, V.B. purchased a Caribbean cruise for McDONALD and McDONALD'S guest for $9,583.10.

      (b)  On or about December 19, 2002, pursuant to the kickback and fraud arrangement, McDONALD issued a fraudulent Company-1 invoice to NIS for $1,375.00.

Thereafter, V.B. sent a $1,375.00 check to Company-1 through the United States mails from NIS's office in New Jersey to McDONALD in New Jersey.

(c) On or about July 22, 2003, pursuant to the kickback and fraud arrangement, N.S. issued a fraudulent invoice to NIS for $1,000.00. Thereafter, V.B. provided a $1,000.00 check to N.S..

(d) On or about June 22, 2004, pursuant to the kickback and fraud arrangement, McDONALD issued a fraudulent Company-1 invoice to NIS for $4,650.00. Thereafter, V.B. sent a $4,650.00 check through the United States mails from NIS's office in New Jersey to McDONALD in New Jersey.

(e) On or about September 17, 2004, pursuant to the kickback and fraud arrangement, McDONALD caused P-C to send a check through the United States mails to NIS in payment of an NIS invoice that was fraudulently inflated.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

## COUNT EIGHT: 18 U.S.C. § 371
## (Kickback and Fraud Conspiracy)

1.      The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1 of this Indictment are hereby realleged as if set forth fully herein.

## INTRODUCTION

2.      At all times relevant to this Indictment unless otherwise stated:

(a)  JAMES E. HAAS, JR. (hereinafter "HAAS") was responsible for acquiring sub-contracts for a company that provided common backfill (hereinafter "CBC") as a sub-contractor to P-C at Federal Creosote.  HAAS was the primary point of contact at CBC for McDONALD and N.S. on these sub-contracts.

(b)  N.S., a co-conspirator not named as a defendant herein, was the Assistant Project Manager / Contracts Administrator for P-C at Federal Creosote and was influential in the procurement of sub-contracts at the site from approximately December 2001 through October 2003.

26

## THE CONSPIRACY

3.     From approximately June 2002 until approximately September 2004, the exact dates being unknown to the United States, in the District of New Jersey and elsewhere, defendants

GORDON D. McDONALD and
JAMES E. HAAS, JR.

knowingly and willfully conspired and agreed with each other, N.S., and others to:

(a) provide and attempt to provide kickbacks to McDONALD and N.S., to solicit and accept kickbacks from HAAS, and include the amount of the kickbacks in the sub-contract prices charged to P-C at Federal Creosote, thereby causing P-C to charge those inflated prices to the EPA and the United States, contrary to Title 41, United States Code, Sections 53 and 54; and

(b) execute a scheme or artifice with the intent to defraud the United States, namely the EPA, and with the intent to obtain money or property by means of materially false and fraudulent pretenses, representations and promises in the procurement of property and services as a prime contractor with the United States and as a sub-contractor in connection with Contract One, as referenced in Paragraph 1 of Count 1, where the value of that contract was $1 million or more, contrary to Title 18, United States Code, Section 1031.

## MEANS AND METHODS OF THE CONSPIRACY

4.      Among the means and methods employed by McDONALD, HAAS, and N.S. to carry out the conspiracy and effect the unlawful objects set forth above were those set forth in Paragraphs 5 through 7 below.

5.      It was part of the conspiracy that McDONALD, HAAS, and N.S. agreed to inflate the bid price of a sub-contract at Federal Creosote without USACE's knowledge, consent, or authorization.

6.      This fraudulently inflated amount included kickbacks HAAS and CBC provided to McDONALD and N.S.. McDONALD and N.S. caused P-C to include the fraudulently inflated amount as part of the costs it charged to the EPA under Contract One for work performed by CBC.

7.      It was also part of the conspiracy that McDONALD and N.S. awarded a sub-contract to CBC in return for HAAS's payment of kickbacks to McDONALD and N.S.

8.      It was further part of the conspiracy that McDONALD and N.S. caused P-C to make payments to CBC based on fraudulently inflated invoices relating to the sub-contract.

## OVERT ACTS

9.     In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and others known and unknown, committed the following overt acts, among others, in the District of New Jersey and elsewhere:

(a)  On or about April 11, 2002, HAAS caused CBC to submit a bid to P-C that was fraudulently inflated by at least $0.50 per ton.

(b)  On or about July 15, 2002, McDONALD submitted to USACE a request from P-C to award a sub-contract to CBC based upon CBC's fraudulently bid price.

(c)  On or about July 15, 2002, McDONALD and CBC caused P-C to issue a purchase order with a price that was fraudulently inflated.

(d)  On or about April 16, 2003, pursuant to the kickback and fraud arrangement, HAAS caused CBC to cash a $7,000 check, which was provided to N.S.

(e)  On or about June 2, 2004, pursuant to the kickback and fraud arrangement, HAAS caused CBC to send approximately $7,000 in cash to N.S. by Federal Express.

(f)  On or about September 7, 2004, pursuant to the kickback and fraud arrangement, McDONALD caused P-C to issue a check for $2,520.74 to CBC in payment of a CBC invoice that was fraudulently inflated.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

## COUNT NINE: 18 U.S.C. §1031
### (Major Fraud Against the United States)

1.      The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1; and

Paragraphs 2 and 5 through 8 of Count 8 of this Indictment are hereby realleged as if set

forth fully herein.

2.  On or about June 9, 2003, in the District of New Jersey and elsewhere, the

defendants

GORDON D. McDONALD and
JAMES E. HAAS, JR.

knowingly and willfully executed and attempted to execute a scheme and artifice with the

intent to defraud the United States, namely the EPA, and with the intent to obtain money

and property by means of materially false and fraudulent pretenses, representations and

promises, by McDONALD and HAAS fraudulently inflating a CBC invoice that was

submitted to P-C in the procurement of property and services as a prime contractor with

the United States and as a sub-contractor in connection with Contract One, the value of

which contract was $1 million or more.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1031(a).

## COUNT TEN: 26 U.S.C. §7206(1)
### (Subscription to a False Tax Return)

1.      The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1; and Paragraphs 2 and 5 through 7 of Count 3 of this Indictment are hereby realleged as if set forth fully herein.

2.      On or about April 15, 2004, in the District of New Jersey and elsewhere, defendant

### GORDON D. McDONALD

unlawfully, willfully and knowingly did make and subscribe to U.S. Income Tax Returns for an S Corporation, Forms 1120s, and U.S. Individual Income Tax Returns, Forms 1040, for the tax year 2003, which was verified by a written declaration by McDONALD that it was made under penalties of perjury, and which income tax returns he did not believe to be true and correct as to every material matter, in that Line 19 reported $783,286 as "Other deductions/Outside Services", whereas, he then and there well knew and believed, Company-1 did not have deductions in the amount reported.

ALL IN VIOLATION OF TITLE 26, UNITED STATES CODE, SECTION 7206(1).

## COUNT ELEVEN: 26 U.S.C. §7206(1)
### (Subscription to a False Tax Return)

1.     The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1; and Paragraphs 2 and 5 through 7 of Count 3 of this Indictment are hereby realleged as if set forth fully herein.

2.     On or about April 15, 2005, in the District of New Jersey and elsewhere, defendant

### GORDON D. McDONALD

unlawfully, willfully and knowingly did make and subscribe to U.S. Income Tax Returns for an S Corporation, Forms 1120s, and U.S. Individual Income Tax Returns, Forms 1040, for the tax year 2004, which was verified by a written declaration by McDONALD that it was made under penalties of perjury, and which income tax returns he did not believe to be true and correct as to every material matter, in that Line 19 reported $217,419 as "Other deductions/Outside Services", whereas, he then and there well knew and believed, Company-1 did not have deductions in the amount reported.

ALL IN VIOLATION OF TITLE 26, UNITED STATES CODE, SECTION 7206(1).

## COUNT TWELVE: 18 U.S.C. § 1512(c)(2)
## (Obstruction of Justice)

1.     The allegations set forth in Paragraphs 1 and 5 through 9 of Count 1 of this
Indictment are hereby realleged as if set forth fully herein.

## INTRODUCTION

2.     The Internal Revenue Service Criminal Investigation (hereinafter "IRS") is a
federal government agency authorized by law to investigate tax violations.

3.     Beginning in or about 2007, the IRS initiated a proceeding to investigate tax
violations by McDONALD and others. It was material to the IRS's investigation to
determine whether McDONALD had taken false deductions on tax returns of Company-1
and whether Company-1 had properly characterized certain payments it received on its tax
returns.  As such, the IRS interviewed McDONALD.

## DESCRIPTION OF THE OFFENSE

4.     On or about January 3, 2008, defendant

GORDON D. McDONALD

unlawfully, willfully, and knowingly, corruptly obstructed, influenced, and impeded an
official proceeding of the Government of the United States, that is an investigation by the
IRS, by making material false statements to the IRS about the purpose of certain
Company-1's payments and the purpose of certain payments to Company-1.

33

## JURISDICTION AND VENUE

5.    The aforesaid conduct occurred, in part, within the District of New Jersey

within the five years preceding the filing of this Information.

ALL IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTION 1512(c)(2).

A TRUE BILL:

*8/31/09*

Dated:

_____
SCOTT D. HAMMOND
Acting Assistant Attorney General

_____
MARC SIEGEL
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

_____
RALPH T. GIORDANO
Chief, New York Office

_____
JEFFREY D. MARTINO

_____
ELIZABETH PREWITT

_____
HELEN CHRISTODOULOU
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 264-0653

34

CASE NUMBER: 09-056 (JAG)

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

GORDON D. MCDONALD,
JOHN A. BENNETT, and
JAMES E. HAAS, JR.

# INDICTMENT FOR

**18 U.S.C § 371**
**18 U.S.C § 1031**
**18 U.S.C § 1956 (h)**
**15 U.S.C § 1**
**41 U.S.C § 53 & 54**
**26 U.S.C § 7206**
**18 U.S.C § 1512 (c)(2)**

A True Bill,

_____
Foreperson

_____
**SCOTT D. HAMMOND**
*ACTING ASSISTANT ATTORNEY GENERAL,*
*ANTITRUST DIVISION*

_____
JEFFREY MARTINO
*TRIAL ATTORNEY*
212-264-0653

USA-48AD 8
(Ed. 1/97)